FILED
2011 Mar-31  AM 09:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **WANDA D. MILLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:09-cv1979-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security** | ) | |
| **Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF DECISION

## I. INTRODUCTION

On March 21, 2007, the claimant, Wanda Miller applied for a period of disability and disability insurance benefits under Title II of the Social Security Act. (R. 141). The claimant alleges disability commencing on February 13, 2007 because of bipolar disorder, manic depression, paranoia, high blood pressure, diabetes, gout in her feet, irritable bowel syndrome, and suicidal thoughts. (R. 218). The Commissioner denied the claim, both initially and on reconsideration. (R. 115). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on August 28, 2007. (R. 121). In a decision dated August 28, 2007, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and thus, was ineligible for social security disability insurance. (R.108). On February 2, 2008, the Appeals Council granted the claimant's request for review and remanded the claim back to ALJ. (R. 112). In a decision dated February 12, 2009, the ALJ found

1

that the claimant was not disabled as defined by the Social Security Act, and thus, was ineligible for social security disability insurance. (R. 22).  On August 4, 2009, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration.  (R.1).  The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. § § 405(g) and 1283(c)(3).  For the reasons stated below the court finds that the decision is due to be reversed and remanded.

## II. ISSUE PRESENTED

The claimant presents the following issue[1] for review: whether the ALJ failed to provide good cause for his rejection of the opinion of Ms. Miller's treating physician, Dr. Anakwenze.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No... presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. The Commissioner's factual determinations, however, are not reviewed *de novo*, but are affirmed if supported by substantial evidence. "Substantial evidence" is "more than a mere

---

[1]Claimant raised two other issues on appeal; however, because the first issue on appeal is meritorious, the court need not address the other two.

scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

An ALJ must accord substantial or considerable weight to the opinion of a treating

3

physician unless "good cause is shown to the contrary." *MacGregor v. Bowen,* 786 F.2d 1050, 1053 (11th Cir. 1986); *Broughton v. Heckler*, 776 F.2d 960 (11th Cir. 1985).  The ALJ must "specify what weight is given to the opinion of the treating physician and any reason for giving it no weight, and failure to do so is reversible error." *MacGregor*, 786 F.2d 1053.  Courts in this circuit have found good cause where the treating physician's opinions were not supported by evidence or were merely conclusory, *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987); where the evidence supported a contrary finding, *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004); or where the opinion was inconsistent with the physician's own records, *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991).

## V. FACTS

The claimant has a high school diploma and was fifty-one years old at the time of the administrative hearing. (R. 60, 64). Her past work experience includes employment as a machine operator. (R. 238). Claimant alleges that she has been unable to work since  February 13, 2007 because of bipolar disorder, manic depression, paranoia, high blood pressure, diabetes, gout, irritable bowel syndrome, and suicidal thoughts. She has not engaged in substantial gainful activity since the alleged onset date. (R. 218).

*Medical History*

The claimant has a history of high blood pressure.  On October 14, 2004, Dr. Marcia Chesebro, a family practitioner, wrote claimant a prescription for Lisinopril Hydrochlorothiazide (blood pressure medication) 40 mg. (R. 290).  The record does not include any additional

information regarding claimant's October 14, 2004 prescription.  On April 12, 2005, Dr. Chesebro found claimant's  hypertension (HTN/high blood pressure) was stable. (R. 288).  On August 2, 2005, Dr Chesebro determined claimant's HTN was well controlled.  On October 10, 2005, Dr. Chesebro determined claimant's HTN was stable.  (R. 282).  On February 4, 2006, Dr. Albert found claimant's HTN was controlled. (R. 287). On July 12, 2006, Dr. Albert noted claimant was taking Lisinopril (highblood pressure treatment) 10/12.5 mg. (R. 320).  On January 19, 2007, Dr. Albert increased claimant's Lisinopril prescription to 20/12.5 mg. (R. 301).

The claimant has a history of gout, a form of arthritis.  On June 30, 1998, claimant complained of diffuse arthralgias (joint pain) in her knees and hips  to Dr. Howard Miller, an orthopaedic surgeon.  Dr. Miller determined that claimant does not have inflammatory arthritis but placed her on ibuprofen 600mgs. (R. 276).  On July 14, 1998, Dr. Miller reported "the symmetry of her symptoms as well as the gel type stiffness of her fingers in the morning suggest an inflammatory process despite the laboratory studies."  Dr. Miller recommended claimant see a rheumatologist and started her on Relafen 1500 mgs daily. (R. 275).

On November 30, 2004, Dr Chesebro wrote claimant a prescription for Allopurinol (used to treat excess uric acid and its complications, including gout) 100 mg. *Id.*  The record does not include any additional information regarding claimant's November 30, 2004 prescription.  On April 12, 2005, Dr. Chesebro's notes indicate a decrease in claimant's uric acid levels from 7.6 to 6.3 and claimant's hyperuricemia (abnormally high uric acid) was stable. (R. 288).  On October 7, 2005, laboratory analyses revealed claimant's uric acid level was 5.7. (R. 283).  On October 10, 2005, Dr. Chesebro determined claimant's uric acid levels were acceptable.

On February 24, 2006, digital scans of the claimant's right foot revealed soft tissue swelling but neither fracture nor dislocation was identified.  The scans revealed the tibia talus relationship was normal. (R. 295).  On April 4, 2006, claimant complained of joint pain in her ankle; Dr. Charles Albert, an internist, performed a history and physical examination on claimant and reported that she has gout and noted slight swelling on her right ankle.  (R. 327). On October 11, 2006, a computerized tomography scan showed degenerative changes of the sacroiliac joints and the lower lumbar spine. (R. 314)

The claimant also has a history of diabetes and irritable bowel syndrome (IBS).  On July 7, 2006, Dr. Albert wrote claimant a prescription for Metformin (used to treat type 2 diabetes) and advised claimant to increase her exercise and lose ten pounds by her next appointment.  (R. 322). On April 4, 2006, Dr. Albert identified claimant as having IBS.  (R. 327).  On October 11, 2006, Dr. Albert reported claimant's intestinal pattern was normal. (R. 314).  On February 21, 2007, Dr. Anakwenze noted claimant was taking Sulfasalzin (IBS treatment) 500 PRN. (R. 399).

Further, the claimant has a history of depression, anxiety and bipolar disorder.  On April 12, 2005, claimant complained of having anxiety and requested to restart Buspar (anti-anxiety medicine).  Dr. Chesebro restarted claimant on 5mg. of Buspar. (R. 288).  On August 2, 2005, claimant complained of depression, insomnia, and poor concentration. Dr. Chesebro reported claimant's dysphoric (emotional state characterized by anxiety, depression, or unease) was situational and, in response, she increased Buspar to two or three times per day. (R. 287)  On October 10, 2005, claimant complained of depressive symptoms each morning and mentioned that she previously took Prozac, Zoloft, and Wellbutrin.  (R. 282).  On July 6, 2006, claimant claimed

6

to be experiencing depression and anxiety, and Dr. Albert prescribed Zoloft 100 mg per day. (R. 323). On November 21, 2006, Dr. Albert noted claimant was very depressed and stopped taking Zoloft. Dr. Albert advised claimant to resume her Zoloft prescription. (R. 306). On March 7, 2007, Dr. Albert noted claimant was bipolar and paranoid. (R. 299).

On February 21, 2007, claimant began seeing Dr. Anakwenze, claimant's attending psychiatrist, for depression. (R. 399). Dr. Anakwenze assessed a GAF score of 45, diagnosed claimant with bipolar disorder, and prescribed her Abilify (antipsychotic medicine) 10 mg and Lamictal Orange Starter (prevents extreme mood swings of bipolar disorder). (R. 400). On February 28, 2007, claimant reported that she was not doing well and could not tolerate Lamictal. Dr. Anakwenze discontinued claimant's use of Lamicatal and started claimant on Depakote (mood stabilizer) 500 mg and increased Abilify prescription to 15 mg. (R. 398). On March 19, 2007, claimant stopped Abilify because of the side affects and no longer took Depkote in the mornings; however, she continued to take them in the evenings. Dr. Anakewenze prescribed Ativan (used to treat anxiety disorders and anxiety related to depression) 1 mg and Seroquel (antipsychotic medicine) 50 mg. (R. 397).

On April 2, 2007, claimant reported that she stopped taking her medication for a few days while taking care of her sick sister. Dr. Anakwenze noted claimant was angry, pacing and mildly agitated. (R. 396). In a letter dated the same day, April 2, 2007, Dr. Anakwenze stated the claimant had episodes of severe depression, mood fluctuations and euphoria. The claimant had become manic and impulsive with poor sleep and inability to function at work. Dr. Anakwenze stated the claimant had very poor concentration, paranoia and active psychotic symptoms. (R.

332).   On May 1, 2007, claimant said she was "more down than up," and Dr. Anakwenze noted claimant's mood was a little depressed, her mind was racing, and she had not had hallucination in two weeks.   Dr. Anakwenze prescribed Geodon (treatment for bipolar disorder) 40 mg for 3 days then Geodon 80 mg. (R. 395).   On May 30, 2007, claimant reported to Dr. Anakwenze she was doing fairly well, but he reported a GAF score of 45-50 .   (R. 394).

On May 2, 2007, the claimant visited a consultative psychologist, Dr. Atkinson. Claimant received a diagnosis of a bipolar disorder and her most recent episode was depression.   Dr. Atkinson found the claimant was likely to be functioning on the average range with sufficient judgment to make acceptable work decisions and she had a GAF score of 50.   However, the claimant did not have sufficient judgment to direct or manage funds.   (R. 338-339).

On July 30, 2007, Dr. Anakwenze completed a medical assessment on the claimant.   The assessment reflected that she had a bipolar affective disorder with mild to severe functional limitations pertaining to her abilities to make occupational adjustments.   The claimant had moderate to no limitations in her abilities to understand, remember and carry out job instructions. The claimant had moderate to no limitations pertaining to her abilities to make personal and/or social adjustments.   The claimant had severe limitations in her ability to deal with the public and deal with work stress.   However, Dr. Anakwenze stated the claimant was capable of managing benefits in her own best interest. (R. 368-371). On July 31, 2007, claimant reported she felt better to Dr. Anakwenze, however Dr Anakwenze determined claimant's mood was mildly depressed. (R. 393).   On September 9, 2007, Dr. Anakwenze stated the claimant had chronic severe bipolar disorder that resulted in the functional limitations noted in the July 30, 2007 evaluation and that

8

those functional limitations would be the same or similar for the next twelve months. (R. 390).

On May 3, 2007, the claimant visited Dr. Gillis for a consultative physical examination. The exam determined the claimant had a bipolar disorder, diabetes mellitus, hypertension, status post carpal tunnel repair, gout, inflammatory bowel disease and hyperlipidemia. Upon examination, the claimant was 61 inches tall and weighed 222 pounds. She had normal ranges of motion in her spine and joints. Claimant was able to fully squat and arise, and she successfully completed the heel and toe walk. She had 5/5 muscle strength in her extremities and her reflexes were normal. Dr. Gillis found that because of claimant's bipolar disorder she is limited in the types of jobs she can perform and her inflammatory bowel disease might also present some problems in a job setting. (R. 341-343).

A coronary angiograpy performed on the claimant on August 9, 2007 was normal. No evidence of soft or hard plaque existed within the imaged coronary arteries. The cardiac chambers were normal. A corresponding echo-cardiogram revealed no evidence of aortic insufficiency. The claimant had normal left ventricular systolic function, normal valve structure and function, and no evidence of septal defect or pericardial effusion. (R. 375-379).

On August 19, 2008, Dr. Haney, a psychiatrist, performed a consultative psychological evaluation on claimant. The claimant reported taking multiple medications with some improvement in her symptoms and denied any negative side effects. Dr. Haney noted the claimant appeared quite sad and agitated. Administration of the Wechsler Adult Intelligence Scale III revealed the claimant had a full scale IQ of 80, verbal IQ of 84, and a performance scale score of 80. Dr. Haney determined these scores placed the patient in the low average range of intellectual

9

functioning and corresponded to the ninth percentile.   Most of claimant's subtest scores were below average with the exception Digit Span, which fell in the average range.  In a corresponding "Medical Source Statement of Ability to Do Work-Related Activities (Mental)," John R. Haney, Ph.D., assessed the claimant as having mild limitations in her abilities to understand, remember, carry out simple instructions, and make judgments on simple work-related decisions.  The claimant had moderate limitations in her ability to remember and understand complex instructions.  She had marked limitations in her ability to make judgments on complex work-related decisions.   The claimant had moderate restrictions in her abilities to interact appropriately with the public, supervisors, and co-workers.  She had mild functional limitations in her abilities to respond appropriately to use work situations and changes in a routine work setting.  Dr . Haney found the claimant's ability to function in most jobs appeared moderately to severely impaired due to her physical and emotional limitations, and her condition was expected to last at least six months to a year.  The factors upon which he based her limitations were "multiple physical problems, many bi-polar symptoms currently; and long history of mental instability."  (R. 406-409).

On November 3, 2008, Dr. Anakwenze stated the claimant suffered from chronic severe bi-polar disorder that had and will result in the same functional limitations found in his evaluation of July 30, 2007 and that these functional limitations will be the same or similar for the next twelve months. (R. 412).

*ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental security income,

the claimant filed a request for reconsideration and received a hearing before an ALJ. (R. 115; 112). At the hearing, the claimant testified that her primary impairment that prevents her from working is her bipolar disorder.  (R. 71). She testified that she has diabetes, high blood pressure, gout, high cholesterol, degeneration in her joints, irritable bowel syndrome, and anxiety (R. 71, 72, 78,84).

The claimant testified that her gout is an intermittent problem and causes her knees, ankles and legs to swell and if she is swollen for several days, she experiences pain.  (R. 71).  She testified that she regularly sees Dr. Anakwenze and that her depression was an up and down struggle until about three months prior to the hearing, when her depression grew progressively worse. She testified that Dr. Anakwenze put her on one Wellbutrin a day and then increased her dosage to two Wellbutrins a day. (R. 76).

The claimant testified that she is not been able to go back to work because she wakes up some days and "cannot face the world." She testified that some days she does not get out of bed and is so depressed that she cries all day, and other days she gets so angry she could "rip someone's head off."  She testified that her emotions are not balanced, and her doctors try different medications for six to eight months at a time and then change the medication because it does not control her depression. (R. 85).

The claimant testified that she can lift 10 to 15 lbs with both hands together.  She testified that she can sit for 30 minutes and stand for an hour at a time.  The claimant also testified that she can walk about a quarter of a mile before she needs to stop. (R. 86).

A vocational expert, Ms Neel, testified concerning the type and availability of jobs that a

11

hypothetical person with similar ailments and characteristics as the claimant was able to perform. She stated the claimant could perform light, unskilled work or cart/cashier work, such as a potato inspector or facility room clerk.  The ALJ asked Ms. Neel how many days in a typical month could an individual miss work and still maintain employment.  She replied that with an unskilled job, the employee could miss no more than two days a month and if her absenteeism is chronic, then she would not be able to even hold that job.  (R. 90-91).

The claimant's attorney asked Ms. Neel to return back to the hypothetical the ALJ explained to her but also to include Dr. Anakwenze's evaluation, indicating that the claimant's mind races, and that she experiences severe depression, insomnia, paranoia, and hallucinations. Ms. Neel replied that when an employee experiences sever limitations in dealing with the public, those limitations eliminate the cashier and clerk jobs because employees with those jobs will have to deal with the public.  The attorney then asked whether a severe limitation in dealing with work stresses being would preclude all substantial gainful activity.  Ms. Neel replied that it would preclude all substantial gainful activity. (R. 93).

Ms. Neel stated that a person who has a severe problem with or inability to deal with the public would not be able to do public-related work.  She also stated that a severe inability to deal with work stress will not allow a person to maintain a full-time job.  Ms. Neely testified if both are combined, an individual is not going to be able to work at a full-time job with severe work stress. (R. 45).

The ALJ's Decision

On February 12, 2009, the ALJ issued a decision finding the claimant was not disabled

12

under the Social Security Act. (R. 6).  First, the ALJ found that the claimant had not engaged in substantial gainful activity since the alleged onset of her disability.  (R.11). Next, the ALJ found that the claimant's bipolar disorder, diabetes mellitus, hypertension,  history of carpal tunnel syndrome status post release surgery, gout, irritable bowel disorder, and hyperlipidemia qualified as severe impairments; however, he concluded that these impairments did not singly or in combination manifest the specific signs and diagnostic findings required by the Listing of Impairments. (R. 11-13).

In making this determination, the ALJ found that the medical evidence of record does not indicate the claimant has an impairment or combination of impairments that meets or medically equals the requirement of Sections 1.02 pertaining to joint dysfunction, 9.08 relating to diabetes mellitus, 4.02 *et. seq*. pertaining to cardiac impairments, or 5.06 pertaining to inflammatory bowel disease.  The ALJ considered whether the "paragraph B" criteria are satisfied.  The ALJ found that the claimant's mental impairment does not meet or medically equal the criteria of listing 12.04. The ALJ also found that the claimant has only moderate difficulties in social functioning, noting the evidence of record reveals the claimant has a good work history and claimant reported no difficulties getting along with co-workers on the job.  The ALJ found the claimant has moderate difficulties regarding concentration, persistence or pace.  The ALJ found that the claimant has experienced no episodes of decompensation. The ALJ found that because the claimant's mental impairment does not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the "paragraph B" criteria is not satisfied. (R. 13-14).

The ALJ found that the claimant has the residual functional capacity to perform light

13

work.  To support his conclusion, the ALJ first referenced the notes of Dr. Haney.  The ALJ found that Dr. Haney's records indicated that the claimant had moderate limitations in her abilities to interact appropriately with the public, supervisors, and co-workers and she has mild limitations in her abilities to respond appropriately to usual work situation and to change in a routine work setting.  In making this determination, the ALJ reasoned that, though "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms... [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."(R.16).  To support this conclusion, the ALJ referenced the claimant's treatment records and determined that "the medical evidence does not substantiate the alleged severity of the claimant's condition nor does the record indicate the claimant experiences significant functional limitations." (R. 15-16).

First, the ALJ noted that although the claimant has reported a history of "gout" the evidence reveals the claimant has normal uric acid levels and the record does not contain evidence of ongoing problems with joint pain and recurrent swelling.  The ALJ concluded that the "medical evidence does not substantiate evidence 'degenerative joints' or finding of 'bone on bone' with normal diagnostic scans of the claimant's feet." (R. 16).  The ALJ noted a consultative examination found the claimant to have no evidence of joint abnormalities and the claimant had a good range of motion in her spine and all extremities.   The ALJ noted the treatment notes from Russellville Family Clinic revealed no evidence of joint redness, swelling or warmth in her knees. (R.16).

14

The ALJ also found the claimant's diabetes to be well controlled on her medication regimen and no indication exists that the claimant suffers any significant functional limitations secondary to hypertension or hypercholesterolemia.  The ALJ found that, although the claimant has a reported history of irritable bowel syndrome, the evidence does not indicate the claimant has required significant medical management for this impairment.  The ALJ concluded that the claimant was monitored for the condition because of her genetic disposition.  The ALJ noted that the records reveal the claimant has gained weight rather then lost weight and her weight has not varied more than approximately 20 pounds during the alleged period of disability.  The ALJ also determined that no evidence exists that the claimant requires frequent bathroom breaks or that she has difficulty controlling her bladder and her diagnostic scans revealed normal gas bowel patterns (R. 16).

The ALJ found the medical reports of claimant's hypertension and high cholesterol showed no evidence of a cardiac impairment or coronary artery disease.  The ALJ took note that the claimant's hypertension is treated with medications without reported side effects.  The ALJ also noted that the diagnostic scans and a complete cardiac evaluation reveled normal heart functioning and no evidence of coronary disease.  (R. 17).

Although the claimant did not allege obesity as a basis for disability, the ALJ considered Social Security Ruling 02-01p involving evaluation of obesity.  The ALJ observed that obesity can cause limitation of function and that an individual may have limitations in any of the extertional functions, such as sitting, standing, walking, lifting, carrying, pushing and pulling. The ALJ concluded that the claimant's weight contributes to her inability to perform routine

15

movements, and necessary physical activities at the medium or greater levels of exertion.  The ALJ also found that the claimant's obesity is a contributing factor in her inability to lift and/or carry or perform fine and gross manipulations on a sustained basis of objects weighing in excess of twenty pounds. (R. 17).

The ALJ found that the claimant's symptoms related to her bipolar disorder were not present at a disabling level of severity for a period of twelve consecutive months; they are responsive to treatment with medications and result in no more than moderate functional limitations when she is compliant with treatment recommendations.  To support this conclusion, the ALJ referred to the treatment notes from Dr. Anakwenze, which revealed the claimant's symptoms improved when she was compliant with her medication regiment and when her Depakote levels were within therapeutic range.  The ALJ found that the treatment records reveal the claimant's symptoms fluctuate and that she experienced episodes of exacerbation related to medical noncompliance. (R. 18-19)

The ALJ used the findings of Dr. Haney to assess the claimant's mental limitations for her residual functional capacity.  The ALJ noted that the claimant reported to Dr. Anakwenze that she was depressed at the time of the examination, which indicated to the ALJ that her actual functioning abilities may be higher than stated as the evidence of record reveals the claimant was noncompliant with her medication regimen and experiencing more symptoms at the time of her consultative examination. (R. 19).

The ALJ also found the objective medical evidence did not substantiate the claimant's testimony and gave limited weight to her testimony.  The ALJ gave limited weight to the mental

residual functional capacity evaluation completed by Dr. Anakwenze on July 30, 2007, finding that the assessment was not consistent with the doctor's own treatment records; on July 31, 2007, records indicate that the claimant was doing better and had a global assessment functioning score of 62.  For the same reasons, the ALJ also gave limited weight to statements of Dr. Anakwenze indicating the claimant suffered from chronic severe bipolar disorder, which will result in the same or similar functional limitations for the next twelve months.  The ALJ also gave limited weight to the statements by Dr. Gillis indicating the claimant had a bipolar disorder and inflammatory bowel disease that might present problems in a job setting; the ALJ found that the medical evidence does not substantiate the claimant's subjective reports regarding the limitations associated with either of these conditions, which Dr. Gillis took into consideration in formulating his opinions about her functioning abilities.  The ALJ failed to state the weight given to Dr. Haney's evaluation; however, the ALJ used Dr. Haney's findings to assess the claimant's mental limitations in the residual functional capacity.  The ALJ also determined that at the time of Dr. Haney's evaluation the claimant was depressed, and the depression could cause Dr. Haney's evaluation to be an underestimate of the claimant's actual functional abilities.  Moreover, the ALJ determined that Dr. Haney considered the claimant's reported impairments, which the objective medical evidence does not substantiate, when he formed his medical opinion. (R. 19).

The ALJ next considered the claimant's age, education, work experience, and residual functional capacity to determine if jobs exist in significant numbers in the national economy that the claimant can perform.  The ALJ found that "the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 21).

17

The ALJ found that claimant's testimony was not credible for total disability.  The ALJ stated that he was under the impression that the claimant concocted some of the medical evidence to get out of paying a debt.  The ALJ also noted that the claimant had filed for bankruptcy and her check was severely cut and in light of her smaller pay check, she probably had less incentive to return to work. ALJ determined that the claimant made a lifestyle choice to discontinue working and seek disability, which is not garnishable. (R.20-21).

## VI. Discussion

The claimant argues that the ALJ failed to articulate any legitimate reasons for discrediting Dr. Anakwenze's July 30, 2007 assessment and failed to offer any substantiated reasons for his rejection of the letter signed by Dr. Anakwenze on November 3, 2008. For the reasons stated below, this court finds that the ALJ has failed to articulate good cause for rejecting the treating physician's assessment.

Case law in this circuit requires that the Commissioner accord the opinions of the treating physician substantial or considerable weight.  *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). Absent a showing of good cause, the commissioner cannot discount the treating physician's opinions. *Id*.  Courts in this circuit have found good cause where the treating physician's opinions lack evidentiary support or were merely conclusory *(Schnorr*, 816 F.2d at 582); where the evidence supported a contrary finding (*Lewis*, 125 F.3d at 1440); *(Phillips*, 357 F.3d at 1240); or where the opinion was inconsistent with the physician's own records *(Edwards*, 937 F.2d at 583).

When discounting the opinion of a treating physician, the ALJ must "clearly articulate" his reasons for doing so. *Phillips*, 357 F.3d at 1241.  Clear articulation of reasons entails, in part, that

the ALJ "state specifically the weight accorded to each item of evidence and why he reached that decision." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). Where an administrative agency reaches its conclusion by "focusing upon one aspect of the evidence and ignoring other parts of the record ...we cannot properly find that the administrative decision is supported by substantial evidence." *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986).  For the ALJ to state that he "has carefully considered all the testimony at the hearing, the arguments made, and the documents described in the List of Exhibits" but he does not state the weight accorded to relevant evidence is insufficient. *Ryan v. Heckler*, 762 F.2d 939, 942 (11th Cir. 1985).  Failure to articulate the reasons for giving less weight to the opinion of the treating physician is reversible error. *MacGregor*, 786 F.2d at 1053.

To discount the opinion of a treating physician, an ALJ must at least address any treatment history and objective medical evidence on which that opinion is based.  Dr. Anakwenze's opinion as manifested in the medical assessment form on July 30, 2007 rests on the claimant's five-month treatment history.  Claimant had seen Dr. Anakwenze five times prior to the July 30, 2007 medical assessment, and consistently suffered from bipolar symptoms resulting in her medications being adjusted several times, either because of the side effects or because her medications were not controlling her symptoms.  The medical record also reflects that in the period almost two years prior to the claimant's beginning treatment with Dr. Anakwenze, Dr. Chesebro also faced similar challenges and changed the claimant's prescription regime several times in an attempt to control the claimant's depression and anxiety.  The ALJ found that the treatment records reveal the claimant's symptoms fluctuate and that she experienced episodes of exacerbation related to medical noncompliance; however, the ALJ failed to address the continued fluctuation of the

19

claimant's symptoms while she was compliant and the reason for her noncompliance.  The records show that under Dr. Anakwenze's care  the claimant only stopped her medication for a few days prior to her April 2, 2007 visit when she was taking care of her sister, who subsequently passed away.  On other occasions when the claimant stopped or adjusted her treatment, the cessation was because of the side effects of the medications, resulting in Dr. Anakwenze's adjusting her prescriptions.  Substantial evidence does not support the ALJ's characterizations of the claimant's history as noncompliant.

The ALJ found that Dr. Anakwenze's own treatment notes dated July 30, 2007 contradicted his July 31, 2007 assessment because on July 30, 2007 the claimant's GAF score was 62 and Dr. Anakwenze determined that the claimant's mood was only mildly depressed.  The record shows that claimant's mood fluctuates and her GAF scores are not consistent.  On May 2, 2007, Dr. Atkinson, to whose findings and opinions the ALJ gave substantial consideration, found the claimant was mentally ill and assessed a GAF score of 50, which is indicative of a *severe* impairment in functioning.  Less than a month later, May 30, 2007, Dr. Anakwenze assessed a similar GAF score of 45-50.  Dr. Anakwenze assessment was not contradicted by his treatment notes; the claimant was bipolar and like her mood, her GAF scores also fluctuate.  The consistency that exists between the May GAF assessment of Dr. Anakwenze and Dr. Atkinson provides support for Dr Anakwenze's evaluation. Given the consistency between the doctors' May evaluations, and the changeable nature of bipolar disorder, the perceived "inconsistencies" in the medical records reflect the fluctuation of the disorder and do not provide good cause for rejection of Dr. Anakwenze's opinion.

The ALJ also assigned limited weight to Dr. Anakwenze's findings that the claimant suffered from "chronic severe bipolar disorder which will result in the same or similar functional limitations for the next twelve months." (R. 19). However, the ALJ accorded great weight to the medical source opinion of Dr. Haney, which similarly states that claimant's "ability to function in most jobs appeared moderately to severely impaired due to the patient's physical and emotional limitations" and that "[h]er condition is expected to last at least six months to a year." (R. 407). Despite the great weight given to Dr. Haney's findings, the ALJ attempted to selectively apply those findings. For example, he noted that Dr. Haney "clearly took into consideration" claimant's reports of "unsubstantiated" "significant physical impairments" and assumes that the inaccurate physical reports taint Dr. Haney's assessment of her mental faculties. (R. 19). The court reiterates that Dr. Haney was primarily assessing claimant's *mental* faculties and that his assessment *supports* rather than *contradicts* her treating physician's findings.

The ALJ's decision did not discuss Dr. Atkinson's May GAF score or Dr. Haney's assessment of claimant's ability to work, and the evidence the ALJ provided in support of his denial falls short of a clear articulation of good cause. The ALJ failure to address the similar challenges Dr. Chesebro faced in finding a prescription regime for the claimant, also suggest that he failed to adequately consider the record as a whole, but considered only the noncompliance evidence that supported denial. *See McCruter*, 791 F.2d at 1548 (Where an administrative agency reaches its conclusion by "focusing upon on aspect of the evidence and ignoring other parts of the record…cannot properly find that the administrative decision is supported by substantial evidence.")

The ALJ has not shown that the treating physician's opinions are conclusory (*Schnorr*, 816 F.2d at 582); that they are inconsistent with his own records (*Edwards*, 937 F.2d at 583); or that, taken as a whole, the evidence supported a contrary finding (*Lewis,* 125 F.3d at 1440). Scrutinizing the record "in its entirety to determine the reasonableness of the factual findings," (*Walker*, 826 F.2d at 999), this court finds that the ALJ has failed clearly to articulate good cause for not according substantial weight to the opinion of the treating physician.

Because the first issue on appeal is meritorious, the court does not need to address the second and third issues.

**V. CONCLUSION**

For the reason stated above, the court concludes that the decision of the Commissioner does not clearly articulate good cause for disregarding the opinion of a treating physician. Therefore, substantial evidence does not support the ALJ's decision on that issue.  The court reverses the decision and remands to the Commissioner to determine whether the claimant is entitled to Disability Insurance Benefits.

Dated this 31[th] day of March, 2011.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE